QUALITY FOODS de CENTRO AMERICA, S.A. and Duroparts de El Salvador, S.A., Plaintiffs-Appellants,

v.

LATIN AMERICAN AGRIBUSINESS DEVELOPMENT CORPORATION, S.A., et al., Defendants-Appellees.

No. 82–5212.

United States Court of Appeals, Eleventh Circuit.

Aug. 8, 1983.

Smathers & Thompson, James W. Crabtree, Douglas C. Broeker, Miami, Fla., for plaintiffs-appellants.

James Beasley, Jr., Beasley, Olle & Soto, Edward Soto, Richard C. Williams, Jr., Miami, Fla., for Latin American Agribusiness Development.

Keith S. Rosenn, Coral Gables, Fla., for Joel D. Dreer.

Before RONEY and HILL, Circuit Judges, and MORGAN, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Plaintiffs, Quality Foods de Centro America ("Quality Foods") and Duroparts de El Salvador ("Duroparts"), bring this action under the Sherman Act, 15 U.S.C. § 1, 2, and the Clayton Act, 15 U.S.C. §§ 15, 18, 19, 16, for antitrust injuries allegedly caused by defendant Latin American Agribusiness Development Corporation ("LAAD"), and certain officers and wholly owned subsidiaries of LAAD. The district court dismissed with prejudice plaintiffs' third amended complaint on grounds that it failed to state a valid antitrust claim. Prior to this dismissal, the district court twice granted plaintiffs leave to amend, dismissed Duroparts for lack of standing, and refused to exercise pendent jurisdiction over plaintiffs' alleged state law claims. Upon review, we conclude that the third amended complaint should not have been dismissed with prejudice and that the district court should reconsider whether it will hear the pendent claims of Quality Foods. However, we affirm the dismissal of Duroparts as a party and those pendent claims relating to Duroparts.

### I.

Quality Foods is an El Salvador corporation in the business of growing and processing frozen vegetables. Duroparts also is an El Salvador corporation, which shares a common owner with Quality Foods, but which is in the business of selling reconditioned auto parts. The primary defendant is LAAD, a Panama investment company with its principal place of business in Miami. LAAD is in the business of assisting the development of private agribusiness in Central America with private funds and loans procured from the United States Government.[1] The remaining defendants include: Laad de Centro America ("LAAD–CA"), a wholly owned subsidiary of LAAD responsible for the direction of loans and investments in Central America; LAAD Marketing Company ("LAAD–M"), a wholly owned subsidiary of LAAD that offered marketing services to Central American exporters until going out of business in 1975; United States Agricultural Processor Marketing Services, Inc. ("Marketing Services"), a marketing company formed in 1975 to provide similar services as LAAD–M; Joel D. Dreer, a consultant for LAAD–M and controller of Marketing Services, and Robert Ross, president of LAAD, LAAD–CA and LAAD–M.

This appeal has its roots in a state proceeding initiated by Marketing Services and Dreer against *inter alia* Quality Foods and Duroparts for damages arising from breach of a marketing/representation contract. Quality Foods and Duroparts removed the case to federal district court and counterclaimed for an accounting and sums due on the contract. *United States Agricultural Processors Marketing Services, Inc. v. Quinonez Hermanos, S.A. et al.,* No. 76–839–CIV–EBD (pending). Quality Services and Duroparts also attempted to assert a third party complaint against LAAD–M, Ross, and Dreer. When the trial court dismissed the third party complaint on grounds that it was unrelated to the main suit, Quality Foods and Duroparts filed a separate suit in federal court against LAAD, the parent company, alleging various antitrust violations, as well as the breach of contract and common law fraud claims dismissed with the attempted third party complaint.

The present antitrust suit was filed in December 1976, and was accompanied by a request to produce. LAAD responded with a motion to dismiss for failure to state a claim and a motion to strike or for a more definite statement. LAAD, however, complied with the request to produce. As a result of these motions, Quality Foods and Duroparts amended their complaint in January 1977. The amended complaint added the remaining LAAD defendants as well as Dreer and Marketing Services. Also included were eighteen additional state law claims.

In March 1978, defendants moved to dismiss the first amended complaint on grounds that the trial court lacked subject matter jurisdiction, that plaintiffs did not have standing, and for failure to state a claim. Defendants also moved "to limit discovery in this case until this Court has ruled upon the jurisdictional issues raised . . . ." Record, vol. I, at 125. By an order dated July 8, 1978, the motions were granted and the action dismissed. Plaintiffs, however, were granted twenty days to file a second amended complaint "properly setting forth the basis for the court's subject matter jurisdiction over the cause of action . . . the plaintiffs' standing . . . and the basis for this court's pendent jurisdiction." At that time, all discovery motions also were held in abeyance until further order of the court.

In July 1978, plaintiffs filed a second amended complaint. The amendments addressed standing, and pendent jurisdiction, but the antitrust allegations remained virtually the same as in the earlier complaints. Again the district court dismissed the complaint with leave to amend. In its order of August 11, 1981, the Court capsulized the

---

1. LAAD operates in cooperation with the United States government and the governments of Latin American countries. LAAD obtains loan funds from the United States Agency for International Development ("AID"), a federal agency.

complaint as alleging that defendants conspired to monopolize the output of Latin American frozen vegetables imported to the United States. Being in the frozen vegetable business, Quality Foods had standing; however, Duroparts, in the business of selling reconditioned auto parts, was deemed to be without standing. The antitrust counts were dismissed for being overly broad, for failing to inform defendants which acts violated which of the antitrust statutes randomly alluded to throughout the complaint, and for failing "to properly plead the elements of the various antitrust claims." The court also noted that plaintiffs were unlikely to state a claim for relief under any conspiracy in light of *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). The court further dismissed plaintiffs' pendent claims because "the twenty common law counts will require proof of facts, additional to those required to prove the antitrust claim."

In October 1981, Quality Foods filed its third amended complaint. The pendent claims were omitted and Duroparts was dropped as a party. Once again, however, the antitrust allegations remained unchanged. Hence defendants' motion to dismiss the third amended complaint for failure to comply with the court's order of August 11, 1981, and for failure to correct the defects of the second amended complaint was granted.

## II.

### A.

Our most difficult task on appeal is weeding through plaintiffs' third amended complaint to determine if it states a legitimate antitrust cause of action. Like its predecessors, the third amended complaint is laden with irrelevant allegations, and allegations which suggest possible breach of contract and fraud claims, but which nevertheless fail to constitute a claim for antitrust relief.

The core antitrust allegations appear in paragraph five of the complaint which begins by alleging a general conspiracy among LAAD, its shareholders, LAAD–CA, LAAD–M, Ross, Dreer and Marketing Services. The alleged conspiracy involved *inter alia* "the direct and indirect acquisition of stock and other share capital of various corporations in competition with each other and the employment of interlocking directorates and officers." Paragraph five contains twenty-three often unrelated and incongruous subparts. Those ostensibly related to the above charges include the following loans allegedly made by LAAD and LAAD–CA:

(1) $300,000 conventional loan (seven years at nine percent) to Industrias Amolonca, a Latin American frozen vegetable producer;

(2) $200,000 convertible loan to Frigorificos Tecnicos, a Latin American frozen vegetable producer;

(3) $200,000 conventional loan to Taylor & Associates, a holding company which owns Frigorificos Tecnicos, and a purchase of $200,000 worth of equity shares of Taylor & Associates;

(4) $60,000 convertible loan to Alimentos Congerados Montebello ("ALCOSA"), a Latin American frozen vegetable producer;

(5) $60,000 convertible loan to Promotora Agricola Basico de Guatemala ("BASICO"), a Latin American fresh vegetable producer; and

(6) $240,000 convertible loan to plaintiff—Quality Foods.

Through these loans, plaintiffs allege that LAAD effectuated a takeover of Industrias Amolonca and Frigorificos Tecnicos, and that all of the named producers are "competitors in foreign commerce" and market "all or most of their production in the United States." Furthermore, "[e]ach of above listed frozen vegetable processors has the potential capacity to produce the total requirements of the United States for certain vegetables." Finally, paragraph five alleges that LAAD and LAAD–CA made numerous loans to Latin American banks, apparently in an effort to foreclose the vegetable producers from obtaining loans other than those controlled by defendants.

Plaintiffs' allegations next turn to the formation of LAAD–M. Indeed, the primary focus of the complaint concerns the alleged misdeeds and misrepresentations of LAAD–M and its primary consultant Dreer during the course of LAAD–M's marketing representation of Quality Foods.[2] During its brief existence, LAAD–M entered into marketing agreements with Quality Foods, Industrias Amolonca, Frigorificos Tecnicos and Taylor & Associates.[3] Accordingly, plaintiffs maintain that LAAD–M was formed to control the marketing (output and pricing) of the frozen vegetables produced by the Central American competitors "in an attempt to insure the continued integrity of the loans made by LAAD and LAAD–CA to these competitors who together comprise 100% of the frozen vegetable producers in Central America." There is no allegation that LAAD loans were contingent upon the use of the marketing services of LAAD–M;[4] however, plaintiffs contend that "[t]hrough the vehicle of LAAD–M, LAAD and LAAD–CA were able to achieve a complete monopolization of all frozen vegetables produced in Central America for importation into the United States."

█ In essence, plaintiffs allege that defendants misused the loan process to acquire equity interests in competing frozen vegetable firms. Because of the lack of local markets, each of the competitors produced frozen vegetables for consumption in United States markets. LAAD–M was formed for the purpose of marketing frozen vegetables in the United States[5] in a manner designed to place LAAD in a position to take over each of the competitors. LAAD allegedly completed a takeover of two of the competitors, and in an effort to takeover Quality Foods, LAAD–M was intentionally manipulating production and price to force Quality Foods into an unfavorable financial position, and hence to enable LAAD and LAAD–CA to call in the loans or to exert pressure for the purpose of obtaining control of Quality Foods. The complaint concludes that defendants' strategy has thus far proven successful because the induced over-production and lowering of prices in the United States market, resulted in a significant profit loss for Quality Foods. Moreover, at the same time LAAD–M was issuing adverse marketing dictates, LAAD and LAAD–CA upgraded the loan to Quality Foods and immediately initiated action to place plaintiffs in default.[6]

### B.

█ In evaluating plaintiffs' third amended complaint for sufficiency, we must accept the facts pleaded as true and con-

---

2. Plaintiffs allege *inter alia* that LAAD–M induced Quality Foods and Industrias Amolonca to breach an output contract with Southern Frozen Foods, Inc., a domestic United States corporation, and then later LAAD–M entered into agreements with Southland to the detriment of· Quality Foods. In addition, it is alleged that LAAD–M failed to provide "expert" marketing services paid for by Quality Foods and Duroparts, failed to inform plaintiffs that LAAD–M's consultant Dreer was a convicted ex-felon, failed to obtain a proper license to conduct business, and conspired with LAAD to assign Quality Foods' and Duroparts' marketing contract, when LAAD–M went out of business, to Marketing Services, a shell corporation allegedly controlled by Dreer.

3. LAAD–M also entered into an agreement to help market Duroparts' reconditioned auto parts. It is for this reason that plaintiffs insist that Duroparts should be a party in this law suit.

4. Apparently ALCOSA, the alleged recipient of a $60,000 convertible loan from LAAD did not employ the marketing services of LAAD–M.

5. If we assume plaintiffs' contention that the relevant product is frozen vegetables and the relevant geographic market is the United States, then the remaining allegations relating to the LAAD's attempt to control "the industries of wood processing, cut flowers, essential oils and beef" are irrelevant.

6. Paragraph 5(u) alleges that LAAD required Quality Foods and its principle shareholder Quinonez Hermanos to agree that an act of default, as to the upgraded loan, would include any lawsuit brought against Hermanos. Contemporaneously with the closing of the upgraded loan, Dreer and Marketing Services brought the state court suit against Hermanos, and LAAD advised Hermanos and Quality Foods that the action constituted an act of default.

strue them in a light favorable to plaintiffs. *Mann v. Adams Realty Co.,* 556 F.2d 288, 293 (5th Cir.1977); *Brett v. First Federal Savings & Loan Association,* 461 F.2d 1155, 1157 (5th Cir.1972); *see, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965); *United States v. New Wrinkle, Inc.,* 342 U.S. 371, 376, 72 S.Ct. 350, 352, 96 L.Ed. 417 (1952). We must not, however, assume plaintiffs can prove facts not alleged or that defendants have violated the antitrust laws in ways not alleged. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). Notwithstanding this caveat, the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low.

■ Rule 8(a)(2) of the Federal Rules of Civil Procedure mandates that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." At one time, the danger of abuse of the antitrust laws—induced by the possibility of treble damage recovery—was thought to necessitate detailed pleading beyond the general notice requirements of rule 8(a)(2). This view, however, has been generally rejected. It is now well accepted that notice pleading is all that is required for a valid antitrust complaint. *E.g., Quinonez v. National Association of Securities Dealers, Inc.,* 540 F.2d 824 (5th Cir.1976). By notice pleading, we mean that the complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

■ Because of the liberal pleading requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be granted. Indeed, such a motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355

U.S. at 45–46, 78 S.Ct. at 102; *accord McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594, 602 (5th Cir.1981); *Quinonez,* 540 F.2d at 826–27. This is particularly true in an antitrust suit where the proof and details of the alleged conspiracy are largely in the hands of the alleged co-conspirators. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Hence the Supreme Court has indicated that a complaint should not be dismissed unless it is found to be "wholly frivolous." *Radovich v. National Football League,* 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957) (quoting *Hart v. B.F. Keith Vaudeville Exchange,* 262 U.S. 271, 274, 43 S.Ct. 540, 541, 67 L.Ed. 977 (1923)).

■ This is not to say that liberal pleading requirements negate the need to draft an antitrust complaint in a careful and thoughtful fashion. An antitrust complaint "must comprehend a so-called prima facie case," *Quinonez,* 540 F.2d at 828, and enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified. 2A J. Moore, *Federal Practice* ¶ 8.17[3] at 81–171 (1982); 5 C. Wright & A. Miller, *Federal Practice & Procedure,* § 1228 at 170 (1982). Conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief. *City of Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1263 (S.D.Fla.1980); 5 Wright & Miller, *supra* at 170. However, the alleged facts need not be spelled out with exactitude, nor must recovery appear imminent. *See United States v. Employing Plasterers Association of Chicago,* 347 U.S. 186, 188, 189, 74 S.Ct. 452, 453, 454, 98 L.Ed. 618 (1954).

■ Plaintiffs' primary argument on appeal has been that a lesser standard than notice pleading should govern the sufficiency of their complaint because they were precluded from obtaining discovery during

the time they were to amend the complaint. They maintain that the court's discovery bar was the reason why the antitrust allegations of the third amended complaint were identical to those in the second amended complaint. This argument is unpersuasive. First, the district court never barred discovery; it simply held discovery motions in abeyance until further order. Second, plaintiffs never again requested discovery after the court's decision to hold earlier motions in abeyance. Third, plaintiff had access to discovery from the earlier lawsuit brought by Marketing Services and Dreer against Quality Foods, and from defendants' initial compliance with requests to produce prior to the motion for a protective order. Finally, the district court's finding of fault with plaintiffs' complaint was not insufficient detail. The problem was plaintiffs' refusal to set forth the elements of the cause of action in a coherent fashion. If anything, the complaint was replete with excessive detail. It is therefore axiomatic that the same pleading rules apply in this case as in any other civil case in federal court: nothing more, nothing less.

### C.

Bearing in mind the established standard of sufficiency we are compelled to conclude that plaintiffs' complaint is sufficient to put defendants on notice of an antitrust cause of action. At a minimum, enough facts can be deciphered from the complaint which, if accepted as true, satisfy the elements of an attempted monopolization in violation of section 2 of the Sherman Act. 15 U.S.C. § 2. Attempted monopolization is prohibited under section 2[7] and has been defined as "the employment of methods, means and practices which would, if successful, accomplish monopolization,

and which, though falling short, nevertheless approach so close as to create a dangerous probability of it . . . ." *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). To state a claim for attempted monopolization, plaintiff must show specific intent on the part of the defendant to bring about a monopoly and a dangerous probability of success. *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1368 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Moreover, like the monopolization offense itself, the attempt must occur within a defined relevant market. *Id.; see Walker Process Equipment,* 382 U.S. at 177, 86 S.Ct. at 350.

Plaintiffs ostensibly allege that defendants intend to monopolize the United States market for frozen vegetables by assuming control of Latin American producers who export to the United States. Although the United States is a large geographic market, the complaint implies that LAAD possessed sufficient market power to effect a change in the price of frozen vegetables in the United States simply by increasing the production of those companies within its control. The potential output of the Latin American competitors (100% of the United States' requirements for certain frozen vegetables) adds to the potential danger of monopoly. Moreover, the danger that LAAD will continue to overtake small foreign producers can be inferred from the allegations that LAAD already controls two of the four Latin American producers (Industrias Amolonca and Frigorificos Tecnicos), is allegedly turning the screws on a third (Quality Foods), and has an equity

---

7. Section 2 of the Sherman Act reads in part:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . .
 15 U.S.C. § 2. The primary distinction between actual monopolization and attempted

monopolization is that proof of specific intent is required in attempt cases. *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 850–51 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *see also Dimmitt Agri Industries, Inc. v. CPC International, Inc.,* 679 F.2d 516, 531–32 (5th Cir.1982), *cert. denied,* ―― U.S. ――, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).

option in the fourth (ALOSCA). In addition, LAAD has an interest in BASICO, the producer of a potential substitute product—fresh vegetables.

■■■■■ The alleged means of accomplishing the monopoly is "predatory pricing." Although the term predatory pricing does not appear in the complaint, allegations of price manipulation are made, as well as numerous references to the pricing and quantity control powers of LAAD and LAAD–M.[8] The complaint implies that defendants' pricing and production policies were predatory in nature and specifically intended to drive Quality Foods, and possibly other competitors, to the brink of financial ruin, at which point, defendants could easily assume control of the competitors. If plaintiffs can prove that defendants were engaging in predatory pricing in an attempt to reap the future benefits of the higher prices that would come with monopolization and there existed a dangerous probability of success, then a claim for relief under section 2 of the Sherman Act would be complete.[9] *See Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 853 n. 16 (5th Cir.), *cert.*

8. For example, paragraph 10(i) of the complaint alleges:

 (i) LAAD and/or LAAD–CA were successful in monopolizing control of AMOLONCA, TAYLOR & ASSOCIATES, and FRIGORIFICOS TECNICOS, S.A., with the effect that LAAD and/or LAAD–CA were able to effect competition by manipulation of prices through the vehicle of LAAD–M and UNITED STATES AGRICULTURAL PROCESSORS MARKETING SERVICE, INC. The effect of the acts herein alleged was to adversely affect the pricing of frozen vegetables marketed for Plaintiff in the United States, which pricing was controlled by Defendant LAAD–M and Defendant UNITED STATES AGRICULTURAL PROCESSORS MARKETING SERVICE, INC., with the result that Plaintiff was damaged in its business because it lost revenues by virtue of the price manipulation. Moreover, because LAAD–M and/or UNITED STATES AGRICULTURAL PROCESSORS MARKETING SERVICE, INC., effectively controlled the output of the various frozen food processors described herein, they were able to manipulate that output for the purpose of causing over production and lower prices in order to ultimately achieve the takeovers herein alleged, which were accomplished by LAAD and/or LAAD–CA.

9. Because of the conspiracy language used in the complaint, the district court logically focused its analysis on section 1 of the Sherman Act, 15 U.S.C. § 1, which renders illegal every contract, combination and conspiracy in restraint of trade. Hence, the fatal flaw of the complaint, as perceived by the district court, was that plaintiffs alleged an intracorporate conspiracy. The suit therefore was dismissed with prejudice because of the court's doubt that plaintiffs could ever state a claim for intracorporate conspiracy in light of *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953) (holding that a corporation cannot conspire with itself). While the general rule is that a corporation cannot conspire with its officers and directors or a wholly owned unincorporated sales division in violation of section 1, the law of this circuit is that a parent and its wholly owned separately incorporated subsidiary can possibly conspire in violation of section 1. *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 244 (5th Cir.1978). Although in *H & B Equipment Co.,* the parent and the subsidiary were competitors, *id.* at 244, the focus of the court was on the form of separate incorporation. *Id.* at 245. Because LAAD and LAAD–M were separately incorporated, therefore, the district court's reference to *Nelson Radio* was probably incorrect.

Similarly, defendants were lured into a section 1 analysis as evidenced by the argument that plaintiffs have failed to state a section 1 offense by failing to allege "that the alleged restraint on trade tends or is reasonably calculated to prejudice the public interest." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir.1979); *see also Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 90 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Although an allegation of public injury generally is required, an exception to this requirement arises when the challenged activity is per se illegal. *See Quinonez,* 540 F.2d at 828. *See generally,* 2A Moore, *supra* ¶ 8.17[3] at 8–167–70. Plaintiffs therefore note that specific allegations of public injury are unnecessary since the alleged price manipulation by the defendants would, if proven, constitute a per se violation. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940); *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 316 (5th Cir.1978).

Because of our finding that the complaint states a claim for attempted monopolization, it is unnecessary for us to address the possibility of a section 1 violation. The above references are made only to sort the arguments presented in an effort to explain the confusion wrought by plaintiffs' complaint.

*denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) (citing *United States v. American Tobacco Co.,* 221 U.S. 106, 180–84, 31 S.Ct. 632, 648–50, 55 L.Ed.2d 663 (1911) and *Standard Oil Co. v. United States,* 221 U.S. 1, 43, 31 S.Ct. 502, 509, 55 L.Ed. 619 (1911)). Moreover, if the actual injury alleged is attributable to defendants' antitrust violation then a claim for treble damages may exist under section 4 of the Clayton Act, 15 U.S.C. § 15. *See id.* at 853.[10]

### D.

 In reaching our conclusion we nevertheless empathize with the district court's frustration and its ultimate decision to dismiss plaintiffs' case with prejudice. In the end, the court gave two reasons for dismissing the action: (1) failure to comply with its order granting leave to amend the second amended complaint, and (2) failure to correct the perceived defects of the second amended complaint. As discussed in note 9, *supra,* one of the perceived defects was plaintiffs' failure to allege an intercorporate conspiracy. The other was plaintiffs' failure to state clearly which acts of defendants violated which antitrust laws. Because we have determined that neither defect was fatal, the question remains whether plaintiffs' resubmission of the second amended complaint (with minor variations) in response to the court's order warranted a dismissal with prejudice. *See* Fed. R.Civ.P. 41(b). Although we acknowledge that the district court's power to control its docket includes the inherent power to dismiss a case, a dismissal with prejudice is a "drastic remedy" that only is proper in extreme circumstances when lesser sanctions are not feasible. *Burden v. Yates,* 644 F.2d 503, 505 (5th Cir.1981). In this instance, the ambiguity of the complaint might have been resolved by addressing defendants' motions to strike and for more definite statement. We are therefore constrained by precedent to hold that the dismissal with prejudice for failure to comply with the court's order was inappropriate. *Id.; see also Brown v. Thompson,* 430 F.2d 1214 (5th Cir.1970). *See generally* 5 Moore, *supra,* ¶ 41.12 at 41–167–68 (explaining the rule of the former Fifth Circuit).

 In holding that the complaint should not have been dismissed, however, we do not intimate that defendants have violated any antitrust laws; we simply hold that the complaint satisfies the very low threshold of sufficiency prescribed by the Federal Rules of Civil Procedure. *See, e.g., United States v. Employing Plasterers Association of Chicago,* 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); *Hitt v. City of Pasadena,* 561 F.2d 606 (5th Cir.1977); *Mann v. Adams Realty Co.,* 556 F.2d 288 (5th Cir.1977); *Quinonez v. National Association of Securities Dealers, Inc.,* 540 F.2d 824 (5th Cir.1976); *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505 (5th Cir.1971); *Singleton v. Foreman,* 435 F.2d 962 (5th Cir.1970); *Equity Capital Co. v. Sponder,* 414 F.2d 317 (5th Cir.1969); *Banco Continental v. Curtiss National Bank of Miami Springs,* 406 F.2d 510 (5th Cir.1969); *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857 (5th Cir.1967); *Barber v. M/V "Blue Cat",* 372 F.2d 626 (5th Cir. 1967). Defendants' arguments that they do not in any way control the United States market for frozen vegetables, and that pricing is a function of market demand, are persuasive but inappropriate in a motion to dismiss for failure to state a claim.[11] We

---

**10.** Section 4 of the Clayton Act provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

**11.** Indeed, the focus of further litigation should be the legitimacy of defendants' price decreases and whether they were in fact predatory. Nonpredatory price decreases in response to legitimate price competition or cost reductions can have the effect of reducing a competitor's profit margin and driving inefficient competitors out of business. However, such decreases are not proscribed by the antitrust laws. *See Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 855 (9th Cir.), *cert. denied,* 439

are compelled by precedent to view the allegations as true, and at this stage of the litigation we are unable to conclude the plaintiffs can prove no facts to support an antitrust claim for relief.

■ However, simply because a complaint can survive a motion to dismiss does not authorize plaintiffs to engage in wholesale discovery. If the district court suspects that plaintiffs' antitrust allegations may be a ploy to obtain discovery unrelated to the antitrust claim, we would urge the court to assume a managerial role and to channel discovery towards determining the true facts relating to the antitrust charges. Once the court is able to ascertain exactly what has occurred, this case may very well wash out on summary judgment. *See Employing Plasterers Association,* 347 U.S. at 189, 74 S.Ct. at 454.

### III.

■ Plaintiff-Duroparts was dismissed from the action for lack of standing on grounds that its claim for lost profits on reconditioned auto parts could not be proximately caused by the alleged antitrust violation in the frozen vegetable market. At best, the court concluded, "Duroparts' injuries were proximately caused by the alleged breach of a marketing agreement, and any relation to the antitrust claim is merely indirect, incidental or subordinate." This statement accurately reflects the nature of Duroparts' claim. Although plaintiffs' second amended complaint contained a conclusory allegation of some attempt by defendants to control the marketing of reconditioned auto parts exported to the United States, no facts were alleged to support this claim. Because the complaint, by its own statement, is restricted to an antitrust violation in the United States market for frozen vegetables, Duroparts lacks standing to

seek treble damages under Section 4 of the Clayton Act. *See Associated General Contractors of California, Inc.,* 103 S.Ct. at 909; *Blue Shield v. McCready,* 457 U.S. 465, 476, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982).

### IV.

Plaintiffs' final contention is that the district court abused its discretion in dismissing the pendent state claims set forth in the second amended complaint. They argue that the district court took so long to render its decision that by the time the pendent claims were dismissed, the statute of limitations would have barred a state court suit. Initially, we note that the true source of delay in this case has been plaintiffs' refusal to plead this case coherently, or to help the district court in any fashion.[12] Moreover, plaintiffs neglected to bring this statute of limitations problem to the district court's attention, and have at no time attempted to file a state court suit.

■ Nevertheless, it is the law of this circuit that a district court be given the opportunity to consider a potential statute of limitations problem in dismissing pendent claims, even at this late date. As stated in *Pharo v. Smith,* 625 F.2d 1226 (5th Cir.1980):

That a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved. *O'Brien v. Continental Illinois National Bank and Trust Co.,* 593 F.2d 54 (7th Cir.1979) ("plaintiffs should have been permitted to pursue their pendent state claims in the federal actions ... when there [was] a substantial possibility that a subsequent state court suit on the claim [would] be

U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). "Antitrust legislation is concerned with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise." *International Air Ind., Inc. v. American Excelsior Co.,* 517 F.2d 714, 721 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

12. While we are reluctantly ruling in favor of Quality Foods, we do not in any way condone the actions of its attorneys who obviously failed to take the time to think through the theory of their case.

time-barred." *Id.* at 65). Though plaintiffs have delayed in calling this statute of limitations problem to the court's attention, we think the problem deserves consideration; the appropriate forum to consider it is the district court. *See In re Carter,* 618 F.2d 1093, 1104–05 (5th Cir. 1980).

625 F.2d at 1227, *see also Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982); *Henson v. Columbus Bank & Trust Co.,* 651 F.2d 320, 325 (5th Cir.1981).

 Therefore, we are compelled to remand to the district court for reconsideration of whether it wishes to exercise the discretion to entertain Quality Foods' pendent claims. In so doing, however, we note that although the potential statute of limitations bar is a necessary consideration, it is not the only consideration. It is not the function of a federal court to rescue a party from the danger of limitation by permitting the litigation of inappropriate matters in federal court. Hence the district court need not reconsider its dismissal for the pendent claims relating to plaintiff—Duroparts, since Duroparts was never properly in federal court in the first place. *Cf. United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Williams v. Bennett,* 689 F.2d 1370, 1379 (11th Cir. 1982) ("A federal court may exercise pendent jurisdiction over state law claims by parties properly before it ...."). For these reasons the judgment of the district court is

AFFIRMED in part; REVERSED in part and REMANDED.