Edward THOMASON, Plaintiff,

v.

**MITSUBISHI ELECTRIC SALES AMERICA, INC., et al.,**
**Defendants.**

**Civ. A. No. 1:88–CV–1901–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 19, 1988.

William J. McKenney, McKenney & Froelich, Atlanta, Ga., for plaintiff.

John G. Creech, Haynsworth Baldwin Miles, Johnson Breckenridge & Harper, Jacksonville, Fla., Richard A. Whiting, Mark D. Whitener, Steptoe & Johnson, Washington, D.C., D. Barclay Edmundson, Paula L. Lehmann, Munger Tolles & Olson, Los Angeles, Cal., for defendants.

## ORDER

SHOOB, District Judge.

Presently before the Court are defendants' motion for additional time to answer plaintiff's complaint, defendants' motion for judgment on the pleadings on plaintiff's first cause of action, and defendants' motion to dismiss plaintiff's second, third and fourth causes of action. The Court will grant the motion for an extension of time *nunc pro tunc.* The remaining motions will be discussed below.

## I. BACKGROUND

Plaintiff Edward Thomason ("Thomason") served as regional sales manager in the Atlanta office of defendant Mitsubishi Electric Sales America, Inc. ("Mitsubishi") from August 1, 1982, until December 31, 1986. Mitsubishi, a Delaware corporation with headquarters located in Cypress, California, develops, manufactures, markets and distributes consumer electronic products throughout the United States and Europe. Although Thomason never had a formal contract with Mitsubishi, he claims Mitsubishi promised him lifetime employment when he was hired.

In December 1986, Mitsubishi's Southeast Regional Vice President Henry Dekker ("Dekker") fired plaintiff from his position with Mitsubishi. Dekker acted with the concurrence of Mitsubishi's Senior Regional Sales Manager for the Southeast Region, William Jennings ("Jennings"). According to Dekker and Jennings, Thomason was terminated because of dissatisfaction with his performance as Mitsubishi's regional sales manager for Atlanta.

On March 18, 1987, Thomason filed a complaint in the United States District Court for the Northern District of Georgia seeking damages for antitrust violations under the Sherman and Clayton Acts and for wrongful discharge and breach of contract. In essence, Thomason claimed that his termination occurred because of his refusal to enforce illegal price maintenance policies promulgated by Mitsubishi. Thomason asserted that Mitsubishi Vice Chairman Sterling Saake ("Saake") and Mitsubishi Executive Vice President Terry O'Flynn ("O'Flynn") adopted the illegal pricing scheme and that Dekker and Jennings were responsible for its enforcement in the Southeast region. All four were named as defendants along with Mitsubishi.

Mitsubishi sought dismissal of most of Thomason's claims based upon lack of standing under the antitrust laws, failure to state a claim under Georgia law, and lack of personal jurisdiction over California defendants Saake and O'Flynn. On October 26, 1987, while these motions were pending before United States District Court Judge Robert L. Vining, Jr., Thomason voluntarily dismissed his complaint without prejudice.

On December 16, 1987, plaintiff filed the current action in the United States District Court for the Central District of California. In his complaint, Thomason sought damages for violation of the Sherman and Clayton Acts, wrongful discharge, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress.[1] As he had alleged in the earlier action, plaintiff claimed that he was fired because he refused to continue enforcing Mitsubishi's price maintenance policies and because Mitsubishi feared that his continued employment would prompt detection of its illegal activity. Defendants moved to transfer the action to the United States District Court for the Northern District of Georgia based on improper venue pursuant to 28 U.S.C. § 1406(a) or under the doctrine of *forum non conveniens* pursuant to 28 U.S.C. § 1404(a). The motion to transfer for improper venue became moot when plaintiff voluntarily dismissed Georgia de-

---

**1.** In both complaints Thomason also asserted a cause of action for failure to pay accrued salary, commissions and bonuses. Because the pending motions do not address this cause of action, the Court's order does not affect the claims raised therein.

fendants Dekker and Jennings on March 10, 1988.

On July 29, 1988, United States District Court Judge William D. Keller granted defendants' motion to transfer the case to the United States District Court for the Northern District of Georgia under 28 U.S.C. § 1404(a). The Court found that the action could have been brought in this district and that judicial economy would be promoted by transfer because a similar suit had previously been filed here and, under California choice of law rules, plaintiff's state law claims probably would be decided according to Georgia law. The Court also noted that Atlanta appeared to be a more convenient forum for the witnesses as well as for plaintiff.

## II. MOTION TO DISMISS

Along with their motion to transfer, defendants filed a motion to dismiss plaintiff's claims of wrongful discharge, breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress that is now before the Court. Defendants claim that under California choice of law rules, Georgia law governs these claims. Because Georgia law does not recognize tort or contract claims for wrongful termination, defendants contend that plaintiff's second and third causes of action must be dismissed. Plaintiff argues that under California choice of law rules, California law applies to this case. If plaintiff is correct in that assertion, he has stated claims under California wrongful termination law.

■ Although Thomason maintains that jurisdiction in this Court exists because of the federal antitrust claims contained in his first cause of action, the Court must address his pendent state law claims according to the principles established for diversity cases in *Klaxon Co. v. Stentor Electrical Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under *Klaxon* a federal court applies the state law of the courts in the state where it is located. Where a case is transferred to a more convenient forum based on 28 U.S.C. § 1404(a), however, the court is obligated to apply the state law that would have applied absent the change in venue. *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964). As the Supreme Court stated in *Van Dusen,* "A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Id.* The Court must determine the applicable law in this case under California choice of law rules because those rules would have applied in the United States District Court for the Central District of California. *See Roofing & Sheet Metal Services v. La Quinta Motor Inns,* 689 F.2d 982, 989, 991–93 (11th Cir.1982).

■ California utilizes a "governmental interest" approach to choice of law problems. *Ledesma v. Jack Stewart Produce, Inc.,* 816 F.2d 482, 484 (9th Cir.1987) (citations omitted). Under the governmental interests approach, the court must "find the proper law to apply based upon the interests of the litigants and the involved states." *Reich v. Purcell,* 67 Cal.2d 551, 553, 63 Cal.Rptr. 31, 432 P.2d 727 (1967). A "true conflict" exists only if the states involved have different laws and each state has a "legitimate but conflicting interest in applying its own law." *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 319, 128 Cal. Rptr. 215, 546 P.2d 719 (1976). If a true conflict is present, California courts resolve the matter based on a "comparative impairment" analysis. "This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." *Id.* at 320, 128 Cal.Rptr. 215, 546 P.2d 719.

The parties agree that Georgia and California law differ with regard to employment termination. Under Georgia law, "[a]n indefinite hiring may be terminated at will by either party." O.C.G.A. § 34–7–1 (1988). As the Georgia Supreme Court held in *Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978) (per curiam), at-will employment in Georgia "gives rise to no cause of action against the employer for alleged wrongful termination." *Id.* at 613, 250 S.E.2d 442. Georgia courts have not allowed any exceptions to this statutory rule. *See, e.g., Goodroe v.*

*Georgia Power Co.*, 148 Ga.App. 193, 251 S.E.2d 51 (1978). California, on the other hand, is one of a growing number of states where "courts have recognized that an employer's traditional broad authority to discharge an at-will employee 'may be limited by statute ... or by considerations of public policy.'" *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 172, 164 Cal.Rptr. 839, 27 Cal.3d 167 (1980) (citations omitted).

Notwithstanding this clear divergence between Georgia and California law, Mitsubishi contends that a "true conflict" does not exist in this case. Defendants argue that because Thomason was employed at all relevant times in Georgia, California has no interest in providing him the benefits of its wrongful termination law. Defendants maintain that California's interest is limited to protection of California resident employees who are unexpectedly terminated. This argument ignores, however, the Supreme Court of California's holding in *Tameny:*

> [A]n employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers....

*Id.* at 178, 164 Cal.Rptr. 839, 610 P.2d 1330. The Court finds that California has a significant interest in preventing California employers from violating duties imposed on them by California law. Defendants' argument that a "true conflict" is not present here lacks merit.

As stated previously, California courts resolve "true conflicts" based on a "comparative impairment" analysis. *Bernhard*, 16 Cal.3d at 320, 128 Cal.Rptr. 215, 546 P.2d 719. The process of weighing conflicting governmental interests should not depend on the court's determination of which law "manifest[s] the 'better' or the 'worthier' social policy on the specific issue." *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 165, 148 Cal.Rptr. 867, 583 P.2d 721 (1978) (quoting Horowitz,

*The Law of Choice of Law in California: A Restatement*, 21 U.C.L.A.L.Rev. 719, 753 (1974)). Instead, the court should assess such factors as the current nature of the statute or law, the gravity of the public concern addressed, and the possibility that the interest might be otherwise satisfied. *Offshore Rental*, 22 Cal.3d at 165–66, 148 Cal.Rptr. 867, 583 P.2d 721. Unfortunately, none of these factors assists the Court in this case because both laws involved here reflect recent legislative enactments on an issue of great public concern that is not otherwise addressed by laws in either state.

The Court concludes that the conflicts question in this case is unusually close. The briefs submitted by the parties demonstrate this dilemma. Thomason argues that the Court should focus on Mitsubishi's status as a California-based employer, particularly because he claims the illegal pricing scheme was conceived and orchestrated in California. Thomason cites no cases, however, to suggest that these factors are more important than those relied upon by Mitsubishi, namely, that all conduct involving Thomason occurred in Georgia.

The Court does not find dispositive the cases cited by defendants. *Paulo v. Bepex Corp.*, 792 F.2d 894 (9th Cir.1986), involved a meat-processing accident in Ontario where the injured employee received compensation under the Ontario Workmen's Compensation Act. The Ninth Circuit affirmed the district court's refusal to allow a products liability suit under California law against the California manufacturer. The availability of limited recovery under Ontario law and the more attenuated causation involved in *Paulo* distinguish the case from the allegations presented here.

*Offshore Rental Co. v. Continental Oil*, 22 Cal.3d at 157, 148 Cal.Rptr. 867, 583 P.2d 721, also relied upon substantially by defendants, involved efforts of a California corporation to recover damages for the loss of services of a key employee injured in Louisiana. The Supreme Court of California held that Louisiana law precluding recovery applied because of "the stronger, more current interest of Louisiana" in its

law. *Id.* at 169, 148 Cal.Rptr. 867, 583 P.2d 721. As stated previously, this factor does not resolve the present controversy because both Georgia and California retain current and vital interest in the application of their respective laws.

In the absence of guidance from California choice of law cases, the Court finds that Georgia's interest would be most impaired by failure to impose its law. In so ruling, the Court does not suggest that California's interest in the conduct of resident employers is any less substantial than Georgia's interest in the treatment of resident employees. The Court bases its determination upon the fact that Georgia law governed Mitsubishi's conduct within the state. That authority necessarily resulted in application of Georgia law to all other aspects of Mitsubishi's relations with its employees. Failure to apply Georgia law concerning wrongful termination in this case, therefore, would produce an unprincipled exception to Georgia's ability to govern the affairs of foreign corporations operating within the state.

Although decided on different grounds, *Offshore Rental* provides support for the Court's approach. In language that easily translates to the present case, the Supreme Court of California stated:

> At the heart of Louisiana's denial of liability lies the vital interest in promoting freedom of investment and enterprise *within Louisiana's borders,* among investors incorporated both in Louisiana and elsewhere. The imposition of liability on defendant, therefore, would strike at the essence of a compelling Louisiana law.

*Id.* at 168, 148 Cal.Rptr. 867, 583 P.2d 721 (emphasis in original). The same reasoning applies here; therefore, the Court holds that under California choice of law rules, Georgia law must be applied in this case.

■ Based on the Court's ruling that Georgia law governs this action, plaintiff's second and third causes of action must be dismissed under *Busbin.*[2] Defendants claim that under Georgia law, plaintiff's fourth cause of action for intentional infliction of emotional distress also must be dismissed. The Court disagrees. Thomason contends that he was fired six days before Christmas for his refusal to enforce an illegal price maintenance policy. As a result of his termination, plaintiff claims he suffered severe emotional distress and physical illness. Although these allegations alone might not amount to the type of insulting, humiliating or embarrassing conduct necessary to prevail on a claim for intentional infliction of emotional distress, *Georgia Power Company v. Johnson,* 155 Ga.App. 862, 274 S.E.2d 17 (1980), plaintiff is entitled to substantiate his claims through discovery.[3] The Court denies defendants' motion to dismiss plaintiff's fourth cause of action.

## III. MOTION FOR JUDGMENT ON THE PLEADINGS

■ After this action was transferred from the United States District Court for the Central District of California, defendants filed a motion for judgment on the pleadings on plaintiff's claim for antitrust damages. Defendants contend that Thomason does not have standing to sue under the Sherman and Clayton Acts. They argue that Thomason did not suffer the type of injury that the antitrust laws were intended to redress and that Thomason cannot pursue this lawsuit as an injured consumer. Thomason claims that discharged employees can sue under the Sherman and

---

**2.** *Busbin* was followed recently in two wrongful discharge cases decided by the Georgia Court of Appeals. *See Gibson v. Winn–Dixie Atlanta, Inc.,* 183 Ga.App. 192, 358 S.E.2d 320 (1987) (communication of false reason for termination does not create cause of action for wrongful discharge); *Garmon v. Health Group of Atlanta, Inc.,* 183 Ga.App. 587, 359 S.E.2d 450 (1987) (failure to follow hospital procedures regarding discipline and termination does not create cause of action for wrongful discharge).

**3.** To prevail on his cause of action for intentional infliction of emotional distress, Thomason will need to show that he suffered because of conduct by the defendants that goes beyond the mere fact of his termination. No matter how much pain plaintiff experienced, Mitsubishi's decision to fire him, without more, is insufficient to support a cause of action for intentional infliction of emotional distress in light of *Busbin* and its progeny.

Clayton Acts and that the seriousness of his allegations should suffice to survive a motion for judgment on the pleadings. The Court will consider Thomason's standing based solely on his employee status because he does not allege injuries to support standing as an injured consumer.

Plaintiff correctly maintains that a motion for judgment on the pleadings should be granted only where there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *Greenberg v. General Mills Fun Group, Inc.*, 478 F.2d 254, 256 (5th Cir.1973) (per curiam).[4] When considering a motion for judgment on the pleadings, all allegations of fact contained in the complaint are assumed to be true. *Cash v. Commissioner of Internal Revenue*, 580 F.2d 152, 154 app. (5th Cir.1978) (per curiam). For purposes of this motion, therefore, plaintiff's claim that he was fired because of his refusal to participate in Mitsubishi's illegal price maintenance scheme is considered true. The question before the Court is whether the Sherman and Clayton Acts authorize a cause of action for plaintiff's claim.

The Sherman Act, as amended, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations." 15 U.S.C. § 1. This statutory provision renders illegal the price maintenance scheme allegedly carried out by Mitsubishi. The Clayton Act, as amended, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. This statutory provision would appear to support the claims made by Thomason.

The Supreme Court has held repeatedly, however, that the Clayton Act does not "allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). From this limitation emerges the concept of antitrust standing, which combines the requirements for constitutional standing with a "determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractor of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). Of particular concern in the present case is the Supreme Court's insistence that antitrust plaintiffs "prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).[5]

In its assessment of plaintiff's injuries, the Court follows the "target area" test adopted by the Eleventh Circuit:

> The plaintiff must show that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Thus, the task before this court is to identify the area or areas of the economy adversely affected by the alleged anticompetitive act and then to determine whether the claimed injury occurred within those areas.

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir.1983) (citations omitted). Since Thomason maintains that Mitsubishi engaged in an illegal price maintenance

---

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all cases decided by the Fifth Circuit before September 30, 1981.

**5.** Because an antitrust plaintiff must suffer direct antitrust injury, "[n]either an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." *National Independent Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir.1984), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 544, 88 L.Ed.2d 473 (1985) (citations omitted).

scheme for its consumer electronic products, the market for those products would appear to be the area of the economy adversely affected by the alleged anticompetitive acts. Under these circumstances, the Court does not see how plaintiff's termination places him within the target area of Mitsubishi's alleged anticompetitive behavior.

Thomason relies primarily on the Fifth Circuit's decision in *Quinonez v. National Association of Securities Dealers, Inc.*, 540 F.2d 824 (5th Cir.1976). In *Quinonez* the Fifth Circuit held that a terminated securities salesman stated a treble damage claim under Section 4 of the Clayton Act where he alleged that securities dealers conspired to deny employment to persons who had been fired by another dealer. *See also Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed. 2d 456 (1957). Although *Quinonez* supports plaintiff's argument that loss of employment is actionable under the antitrust laws, Mitsubishi correctly asserts that *Quinonez* does not authorize standing in this case. *Quinonez* involved allegations of an illegal conspiracy directed at the employment market for securities salespersons. As a result, the injury suffered by Quinonez was a direct consequence of the alleged anticompetitive behavior. While Thomason claims his loss of employment occurred in furtherance of Mitsubishi's illegal price conspiracy, the employment market was not the target of the alleged conspiracy. Thomason simply cannot demonstrate, as he must, that he suffered harm because of a lessening of competition resulting from Mitsubishi's actions.[6]

The Court realizes that the issue of antitrust standing for discharged employees has produced a conflict within the federal court system. The Ninth Circuit granted standing to an employee fired because he refused to participate in a bid-rigging scheme, *Ostrofe v. H.S. Crocker Co.*, 670 F.2d 1378 (9th Cir.1982) (*Ostrofe I*), *vacated and remanded in light of Associated General Contractors*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), *reinstated on remand*, 740 F.2d 739 (9th Cir.1984) (*Ostrofe II*), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985), while the Seventh Circuit held that an executive terminated because of his refusal to adhere to illegal practices did not suffer "antitrust injury" to support standing. *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir.1982) (*Bichan*), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). Most recently, the Third Circuit ruled that a broker fired because he refused to provide unlawful discounts was not the proper party to bring a price discrimination action under the Clayton Act. *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3rd Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed. 2d 40 (1986). *See also McNulty v. Borden, Inc.*, 542 F.Supp. 655 (E.D.Pa.1982) (denying standing to employee allegedly fired for refusal to engage in Robinson–Patman Act violations); *but see Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423 (S.D.N.Y.1986) (granting standing to sales representatives terminated for failure to enforce resale price maintenance schemes).[7]

Nevertheless, the Court believes that Thomason does not possess antitrust standing based on precedents in this Circuit. The Ninth Circuit's position that dis-

---

**6.** Thomason does not claim antitrust injury based on lost sales commissions or other diminution of his ability to serve effectively as a sales representative in the affected market. Thomason would face difficulty proving such injury because, as a Mitsubishi sales manager, any lessening of competition favoring Mitsubishi would produce corresponding gains for Thomason. *See Winther v. DEC International, Inc.*, 625 F.Supp. 100 (D.Colo.1985) (discharged salesman not within area of economy endangered by breakdown of anticompetitive conditions when salesman probably benefited from alleged antitrust violations).

**7.** The *Donahue* decision has been criticized for failing to recognize that "no useful policy is served by granting standing to a terminated employee for a product market violation that is known to others." P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 338d (Supp.1987). Areeda and Hovenkamp argue that dealers restrained by a resale price maintenance scheme will know of the violation and have an incentive to sue. The same criticism would apply if the Court were to grant standing here.

**1570**

charged employees can sue under the antitrust laws did not emerge through application of the "target area" test utilized in the Eleventh Circuit, even though the Ninth Circuit ordinarily uses the same test. *See Ostrofe I,* 670 F.2d at 1389 (Kennedy, J., dissenting) (citations omitted). Instead, the court embarked upon an ad hoc balancing of antitrust enforcement interests. *Id.* at 1383–86 (majority opinion). Although the court identified policy considerations that might support legislative action, the court's balancing approach has never been followed in this Circuit. Moreover, the Ninth Circuit relied in *Ostrofe II* on factors conspicuously absent in the present case. First, Ostrofe was the victim of an employment boycott that provided an independent basis for standing under *Radovich* and *Quinonez. Ostrofe II,* 740 F.2d at 742–43. Second, Ostrofe was an "essential participant" in the price-fixing scheme, which "could not succeed without his active cooperation." *Id.* at 745–46, *quoted in Gregory,* 787 F.2d at 97.

Conversely, the Seventh Circuit applied the "target area" test utilized by the Eleventh Circuit when it held that discharged employees do not have antitrust standing. *Bichan,* 681 F.2d at 517. Explicitly rejecting the position adopted by the Ninth Circuit in *Ostrofe I,* the Seventh Circuit found that "Bichan has sustained no 'antitrust injury' because, while he may have suffered some injury-in-fact, he was not the target of the alleged anticompetitive practices. His injury, therefore, did not result from the defendants' acquisition or exploitation of market power." *Id.* at 519. The same conclusion must be reached here. Thomason did not suffer harm because of a lessening of competition in the market for consumer electronic products. As a result, he fails to meet the requirement that an antitrust plaintiff "must be one against whom anticompetitive activity is directed, and not one who has merely suffered indirect, secondary, or remote injury." *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 710 (11th Cir.1984) (citation omitted).

The Court understands that an employee terminated for refusal to engage in illegal conduct suffers unfair harm. Public policy supports a cause of action for wrongful discharge in such situations. The Court cannot mandate a remedy for plaintiff under the antitrust laws, however, just as it cannot create for him a wrongful discharge claim under Georgia law. If Thomason is correct in his allegations concerning Mitsubishi's conduct, he has suffered injury; but that harm cannot be redressed under the Sherman and Clayton Acts. The Court must grant defendants' motion for judgment on the pleadings.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for judgment on the pleadings on plaintiff's first cause of action. In addition, the Court GRANTS defendants' motion to dismiss plaintiff's second and third causes of action, but DENIES defendants' motion to dismiss plaintiff's fourth cause of action. The Court GRANTS defendants' motion for an extension of the time to answer *nunc pro tunc.*

IT IS SO ORDERED.